N. J. Arnold v. Commissioner.
Arnold v. Commissioner
Docket No. 36427.
United States Tax Court
1953 Tax Ct. Memo LEXIS 332; 12 T.C.M. (CCH) 280; T.C.M. (RIA) 53086; March 17, 1953
*332 William B. Murray, Esq., 525 Failing Building, Portland, Ore., for the petitioner. John H. Welch, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding involves a deficiency of $9,568.27 in income tax for 1945. The issue is whether gain realized by petitioner from sales of lots in 1945 is taxable to him in that year, and, if so, whether the amount constitutes ordinary income or capital gain. Findings of Fact The facts set forth in a stipulation are so found. The petitioner, an individual, residing in Salem, Oregon, and his wife filed a joint return for 1945 with the collector of internal revenue for the district of Oregon. In November, 1942, T. M. Hicks and Ronald Jones purchased from A. N. Bush a farm containing 318 acres situated about four miles from Salem, Oregon, for the purpose of subdividing 168 acres of the land. In December, 1942, petitioner and his wife entered into a contract for the purchase of the other 150 acres of the tract for $27,000, payable $3,000 cash, $1,000 annually thereafter to January 1, 1953, and the balance on that date, with the right to anticipate payments at any time. Interest *333 at the rate of 5 per cent on the unpaid balance was payable annually. No deed was to be given to the buyers until they had complied with all of the terms of the contract of purchase. The down payment was paid by assignment of contracts on houses that petitioner had built to sell. The remainder of the farm was subdivided in 1943 into lots and was given the name Hicks-Jones Subdivision. The sellers in the transactions were represented by Rich L. Reimann, a real estate broker with 23 years of experience at that time. Prior thereto petitioner had purchased and sold some real estate and Reimann had had business transactions with him. Petitioner, who was reared on a farm, purchased the land for farming purposes. While he did not at that time have any intention of subdividing the land into lots, he discussed with Hicks, who frequently bought contracts, on a number of occasions from petitioner, the subject of applying against the purchase price any agreements he might enter into for the sale of portions of the land. He moved onto the premises promptly after acquiring it and lived there until 1950, when he bought another farm. Petitioner actively farmed the land in 1943 and 1944, primarily *334 as a dairy farm. When his brother, who helped him operate the farm, entered the military service in 1944 it was practically impossible to hire farm help and petitioner decided to and did sell his cows and discontinued dairy farming. Thereafter he did not operate the farm as a business. At that time all of the lots in the Hicks-Jones Subdivision had been sold and Reimann informed petitioner that he could sell the land after subdivision into small lots. Thereafter, in 1944, petitioner decided to subdivide the farm into lots. Late in 1944 petitioner commenced, and in 1945 completed, at his expense, a subdivision of his farm into 44 lots and other parcels under the name of Arnold Subdivision. The arrangements for the subdivision work were made by Reimann. Hicks and Jones and their wives certified on the official plat for the subidivision that as owners of the land they had caused the land to be surveyed and platted, and dedicated to public use the roads and streets shown in the plat. Petitioner engaged Reimann to sell the parcels in the subdivision and referred all prospective purchasers to him. Reimann placed a sign on the premises to show that the properties were for sale. During *335 1945 petitioner made 19 sales of 21 lots, comprising about 40 acres, in the subdivision. The sales were made on and after June 6. A written agreement, signed by petitioner and his wife and the buyer, was entered into for each sale. The agreements included the following provisions: "The party of the second part [Buyer] agrees that he will not permit or allow the premises to become subject to any mechanic's lien or other claim by reason of any obligation by him incurred which shall have precedence to the title or interest of the party of the first part in the premises. "The party of the second part agrees to keep all the buildings now on said premises or hereafter erected thereon insured against loss by fire to their full insurable value and to keep the loss, if any, payable to the party of the first part as their interest may appear, and to deliver the policy or policies to the party of the first part upon their issuance. The party of the first part agrees to furnish the party of the second part a complete Abstract of Title or Title Insurance to said premises when the party of the second part has fully kept and performed this contract on their part, showing marketable title *336 to the same, except only as to such incumbrances as the party of the second part has assumed hereunder and except also any incumbrances made or suffered to be made by the party of the second part. "And the second party, in consideration of the premises, hereby agrees that no wood shall be cut on the land (without the consent of the party of the first part) and that no improvement shall be removed from or any strip or waste be made on the premises; and, further, that the second party will make punctual payments of the above sums, as each of the same respectfully becomes due, and that the party of the second part regularly and seasonably pay all taxes and assessments lawfully imposed on said premises. In case the second party, legal representatives or assigns, shall pay the several sums of money aforesaid punctually, and at the time above limited, and shall strictly and literally perform all and singular agreements and stipulations aforesaid, after their true tenor and intent, then and only then will the first party cause to be made and executed unto the second party, their heirs and assigns, upon the surrendering up of this contract, a deed conveying said premises in fee simple. And *337 it is hereby agreed and covenanted by the parties hereto, that the times of the payments are the essence of this contract. And in case the second party shall fail to make the payments aforesaid and each of them punctually, and upon the strict terms and times above limited, and likewise to perform and complete all and each of the agreements and stipulations aforesaid, strictly and literally, without any failure or default, then this contract, so far as it may bind the first party, shall become utterly null and void, and all rights and interests hereby created, or then existing in favor of the second party, shall utterly cease and determine, and the right of possession and all equitable and legal interests in the premises hereby contracted, shall revert and revest in said first party, without any declaration of forfeiture or act of reentry or any other act by said first party to be performed and without any right of said second party of reclamation or compensation for money paid, improvements made or services performed, as absolutely, fully and perfectly as if this contract had never been made. And the said party of the first part shall have the right, immediately upon the failure of *338 the party of the second part to comply with the stipulations of this contract, or any of them, to enter upon the land aforesaid and take immediate possession thereof, together with the improvements and appurtenances thereof belonging. And the said party of the second part covenants and agrees to surrender unto said party of the first part the said land and appurtenances without delay or hindrance, and no court shall relieve the party of the second part from the failure to comply strictly and literally with this contract. And it is further stipulated that no assignment of the premises or this contract shall be valid unless the same shall be endorsed herein, and that no agreements or conditions, or relations between the second party and assignee or any other person acquiring title or interest from or through said party of the second part, shall preclude the first party from the right to convey the premises to the second party or assigns on the surrender of this agreement and the payment of the unpaid portion of the purchase money which may be due to the first party." Reimann was aware when the lots were sold that the sellers did not have a deed for the property. On account of that *339 fact he retained in his possession the original and executed copies of the contracts of sale and installment payments. Reimann's commission for making the sales was an amount equal to the down payments. He gave the vendees receipts for all of the payments made by them. Hicks died intestate August 6, 1945, on which date $19,754 was owed by petitioner on the purchase price of the 150 acres. On February 2, 1946, the administrator of Hicks' estate gave petitioner and his wife a deed for the interest of the estate in the property in consideration of the assignment to heirs of the estate by petitioner and his wife on January 18, 1946, of all of their interest in the contracts of sale of lots in payment of the debt of $19,754. Thereafter in 1946 Reimann delivered to petitioner the amount he had collected on installment payments, and to him and the buyers the contracts of sale of lots he had been holding. In 1947 blocks 1, 2, 3 and 6, consisting of about 72 acres, of the Arnold Subdivision, were resubdivided into 124 lots by the petitioner. In 1943 petitioner, Hicks and Reimann sold a jointly owned farm which they had held for not more than three years. The petitioner spent the following *340 amounts for improvement of the land for sale as lots and tracts: 1944-1945
$3,482.13
1946
1,947.95
1947
2,120.50
1948
282.20
Sales of lots in the subdivisions in and after 1946, as disclosed in petitioner's returns, were as follows: Year
Number of Sales
Sales Price
1946
1
$ 324.00
1947
18
10,905.80
1948
37
26,125.00
1949
8
5,925.00 The gain on the sales made in 1947, 1948 and 1949 was reported on the installment basis as ordinary income. Petitioner has sold all of the lots in the subdivisions except 37 acres in the tract resubdivided in 1947, which are low land and covered with water. During 1943 petitioner was engaged in the amusement business as a sole proprietor. The business consisted of renting phonographs, pinball machines and bowling alleys. The business was operated in 1944 and 1945 by a partnership of which petitioner was a partner. Petitioner reported losses of $2,826.24, $2,599.21 and $1,770.41 from the operation of the farm in 1943, 1944 and 1945, respectively. The gross income in 1945 was reported as consisting of $114.46 from milk and $49.83 representing a refund on feed purchased in 1944. He did not report *341 any transactions in farming operations in returns filed thereafter for years through 1950. The return of petitioner and his wife for 1945, filed March 15, 1946, reported net gain of $14,840.83 on the sale of 21 lots in the subdivision, comprising 40 acres, but did not include the amount in gross income. An amended return for 1945, filed May 20, 1949, reported gain of $1,328.88 realized from the sale of the lots on the installment basis, taxable as long-term capital gain, and $640.84 interest received on deferred payments. Petitioner's return for 1946, filed March 15, 1947, reported gain of $242.50, taxable as ordinary income, from the sale of one parcel of the subdivision for $324. His amended return for that year, filed May 20, 1949, reported profit of $224.32 from the sale, taxable as long-term gain, and long-term gain realized from the sale of the contracts received from purchasers of lots in the subdivision. In his determination of the deficiency, respondent determined that petitioner realized gain of $16,777.51 from the sales, taxable as ordinary income. Opinion Petitioner contends that the sales were not completed transactions until he acquired clear title to the property *342 and since the deed conveying the land to him was not executed and delivered until 1946, the sales were not taxable transactions in 1945. There was no warranty in the contracts of sale that the vendors held legal title to the property or any provision therein that the sales were contingent upon the acquisition of title by them. The vendees had the right of possession and the evidence does not establish that actual possession was not taken. They assumed the burden of ownership by agreeing to pay taxes on the premises and insure improvements against loss by fire under policies payable to the vendors as their interest may appear. The purchase prices were definitely fixed and the vendees were under unconditional obligations to pay the amounts on the terms specified. The vendees possessed no right to receive a deed until they had fully complied with the terms of the sales contracts and until that time the vendors were under no obligation to convey fee simple title. If in the meantime they defaulted under their contracts, petitioner could take possession of the property, including any improvements, with a reversion to him of all title and a right to retain moneys paid on the purchase price. *343 There was no agreement between the vendors and vendees that the contracts of sale and payments made thereunder should be held in escrow until such time as the vendors received a deed for the property sold. Reimann took possession of the contracts because of a belief, lacking a legal basis, that such a course should be followed until the vendors acquired legal title. The subject matter of the contracts passed from the vendors when the various instruments were executed, even though the vendors did not at that time have fee simple title, , and it would have been unavailing for the vendees to assert that such property rights were not held by the vendors at the time of sale. ; ; 66 C.J. 805. The case of , is distinguishable. There, the benefits and burdens of ownership did not pass and no consideration was paid in the year determined by the Commissioner as the period when the transaction was closed for tax purposes. The facts here establish that the sales in question *344 were sufficiently complete in 1945 to constitute closed transactions in that year for tax purposes, and we so hold. ; . The sole difference between the parties on the remaining issue is whether the gain realized is taxable as ordinary income or as capital gain. The issue is governed by whether the property was held primarily for sale to customers in the ordinary course of a trade or business of petitioner. The substance of petitioner's contention is that he was merely engaged in liquidating an asset without engaging in the real estate business, as held and argued here by respondent. The courts have recognized certain tests as helpful in determining whether a taxpayer is holding property primarily for sale to customers in the ordinary course of a trade or business. They include the reason for the acquisition and disposal of the property, the continuity and frequency of sales, the extent of improvements to the property and activities engaged in to sell it. None of the tests are decisive, each case being controlled by its peculiar facts. ; *345 . The facts are quite similar to several cases. In , the taxpayer acquired six tracts of land aggregating 250 acres between 1914 and 1926 and farmed and grazed cattle on it until 1929. Thereafter to 1938 he sold a total of 75 acres in tracts of 2, 3, 5 and 10 acres. In or prior to 1938 he subdivided the land into 548 lots and laid out streets in the subdivisions. He sold a total of 80 of the lots in 1938, 1939 and 1940 and continued to farm the home place he had on the land. The owner did not take out a license as a real estate dealer and other than placing a sign on the property did not advertise the lots. The court held, affirming this Court, that the taxpayer was engaged in two businesses, farming and sale of lots, and that the land was held primarily for sale to customers in the ordinary course of his real estate business. In acres of cattle grazing land acquired by devise in 1928 were subdivided, commencing in 1937, after attempts had been made to otherwise sell the property. A real estate agent laid out the subdivisions, *346 with necessary improvements, and sold a total of 80 lots in 1937, 1938 and 1939, the taxable years. Additional acreage was subdivided in 1939, out of which 42 lots were sold. The court sustained a holding of this Court that the lots were held primarily for sale to customers in the ordinary course of a trade or business, even though all of the sales, as here, were made by a real estate agent employed to dispose of the property on a commission basis. In , inherited land was sold for subdivision purposes. After development of a portion of the land by the vendee in 1934 the vendors reacquired the land at a trustee's sale. Thereafter an agent was engaged to sell, on a commission basis, lots in the subdivision and a bank appointed to deliver contracts, pay commissions, etc., incident to sales. Two additional tracts were subdivided in 1937 and 1938. In holding that the lots sold in 1935 were taxable as ordinary income the court said that in , it laid down the test as follows: "From the cases it would appear that the facts necessary to create the status of one engaged in a 'trade or *347 business' revolve largely around the frequency or continuity of the transactions claimed to result in a 'business' status." The court, in the Ehrman case, then said: "* * * We see no reason for departing from these decisions and now holding that the fact that property is sold for purposes of liquidation forecloses a determination that a 'trade or business' is being conducted by the seller. See also ." Here, petitioner bought the land for farming purposes and after actively farming it at a loss for two years had the property subdivided into lots and small tracts for sale to the general public through a real estate agent. He had previously had some dealings in real estate for profit and after some success with his new venture resubdivided four blocks containing about 72 acres, and thereafter continued to make sales. The fact that the sales were made by an agent engaged for that purpose, instead of through his own efforts, and that petitioner continued to live on the land, engaging in some farming, and had another occupation, is not controlling. Sales were made frequently and the activity continued without interruption. In , *348 cited by petitioner, the sales were only of land in large tracts after timber had been cut therefrom and the property was not improved by other than drainage ditches and public roads. We conclude that the property was held by petitioner primarily for sale to customers in the ordinary course of his trade or business. Accordingly, we find no error in respondent's treatment of the gain as ordinary income. Decision will be entered for the respondent.